C. T. WILLARD CO. v. CITY OF NEW YORK et al.

(Supreme Court, Special Term, New York County. May 22, 1913.)

1. MUNICIPAL CORPORATIONS (§ 373*)—PUBLIC IMPROVEMENT CONTRACTS—ASSIGNMENTS—LIENS—PRIORITY.

Where a public improvement contractor assigned his right to receive payments from a city to a bank to secure advances with which to per-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

form the contract, which assignments were properly filed, they took precedence over subsequently filed liens of materialmen for materials furnished to the contractor and used in performing the work.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 913; Dec. Dig. § 373.*]

2. MUNICIPAL CORPORATIONS (§ 353*)—PUBLIC IMPROVEMENT CONTRACT—ASSIGNMENT—CONSENT BY CONTRACTOR'S SURETY.

Where an assignment of a public improvement contractor's right to payments under his contract to a bank furnishing money with which to perform the contract was absolute in form, its scope was not limited by a consent of the contractor's surety that 15 per cent. of the payments should be retained according to the contract with the city, and should not be assigned until the completion of the work.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 885; Dec. Dig. § 353;* Assignments, Cent. Dig. § 26.]

3. MUNICIPAL CORPORATIONS (§ 373*) — PUBLIC IMPROVEMENTS — CONTRACT—PROCEEDS—LIENS.

Where a public improvement contractor's right to receive payments under his contract was assigned to a bank to secure advances made to enable the contractor to perform, and materialmen filed subsequent liens, any balance remaining after paying the bank's claim, in whosesoever hands it might be, was subject to whatever liens attached thereto.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 913; Dec. Dig. § 373.*]

4. BANKS AND BANKING (§ 132*)—GENERAL DEPOSIT—INTEREST.

Where a bank, having advanced money to a contractor to enable him to perform certain public improvement contracts, took an assignment of the contractor's right to payments under his contract, and credited payments received to the contractor's general deposit account, which was charged with the advances, the bank was liable for interest on the balance of the payments in its hands over advances made for the benefit of materialmen, who had filed liens on the proceeds to be derived from the contract.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 351; Dec. Dig. § 132.*]

5. MUNICIPAL CORPORATIONS (§ 373*)—IMPROVEMENT CONTRACTS—LIENS FOR MATERIALS.

Where a bank, having furnished funds to a public improvement contractor to enable him to perform, took an assignment of his right to receive the proceeds of the contract, and in order to accomplish this was compelled to pay certain premiums on bonds and attorney's fees, but received an agreement from R. by which he contracted to indemnify the bank for all such expenses, the bank was not entitled to charge them against a balance remaining after payment of its advances, as against lien creditors of the contractor for materials furnished, who were limited to such balance for payment of their claims.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 913; Dec. Dig. § 373.*]

6. MUNICIPAL CORPORATIONS (§ 373*)—PUBLIC IMPROVEMENTS—SEPARATE CONTRACTS—CREDITS—INTEREST.

A bank, having agreed to finance a contractor's performance of certain public improvement contracts, received assignments of the contractor's right to payments from the city, and, having received certain payments under the P. contract, used them to finance the performance of the B. contract. *Held* that, since the lienors under neither contract filed their liens for materials furnished the contractor until after the last payment

under the P. contract had been made, and the payments so derived from that contract were necessary to satisfy the bank's claim for advances generally to the contractor, such payments could not be lawfully used, as against the lienors under the P. contract, for the performance of the B. contract, and hence the bank was liable to such lienors for interest on the payments received under the P. contract from the date they were received to the date of final payment.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 913; Dec. Dig. § 373.*]

7. MUNICIPAL CORPORATIONS (§ 373*)—PUBLIC IMPROVEMENT CONTRACTS—PERFORMANCE—LIEN—ENFORCEMENT.

Where defendant S. filed its lien on a public improvement contractor's right to the proceeds of the contract November 26, 1910, and the lien was extended for six months from February 11, 1911, and an action was commenced by another lienor, and a lis pendens filed April 7th, following, whereupon defendant S. interposed an answer on August 8th, his lien was valid, and was not objectionable, in that S. had not obtained a further order extending the lien, nor had itself filed a lis pendens.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 913; Dec. Dig. § 373.*]

8. MUNICIPAL CORPORATIONS (§ 373*) — PUBLIC IMPROVEMENT CONTRACTS — LIENS—ABANDONMENT BY CONTRACTOR—SAVING OF WORK.

Where a public improvement contract provided that, if the work should be abandoned, the city might complete the same and charge the additional expense, if any, to the contractor, but, in case the expense was less than the balance due under the contract, the contractor should forfeit all claim to the remainder, the contractor having abandoned the work, and the city having completed it at a saving, the contractor was entitled to no part thereof, and hence his lien creditors could not subject the amount saved to their liens.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 913; Dec. Dig. § 373.*]

9. MUNICIPAL CORPORATIONS (§ 375*)—PUBLIC IMPROVEMENT CONTRACTS—CONSTRUCTION—PENALTY FOR DELAY.

A public improvement contract provided that if the contractor failed to complete the work in time he should pay $20 a day as liquidated damages, which the city might retain out of the moneys which might be due or become due to the contractor under such agreement. *Held,* that such provision only contemplated payment of liquidated damages where there was a delay in the completion of the contract, and not where the contractor abandoned his contract, the remedy being limited to the deduction of such liquidated damages from sums due on the contract; and hence, there being nothing due, the city could not maintain a counterclaim for damages for delay.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 375.*]

10. MUNICIPAL CORPORATIONS (§ 375*) — PUBLIC IMPROVEMENTS — COUNTERCLAIM.

In an action on a city contract for the construction of a purification plant to filter water for public use, a counterclaim for delay in completing the plant, in which the city claimed damage because it was compelled to purchase water which would otherwise have been provided by the plant, was unsustainable, where the proof of the amount of water the city was actually compelled to purchase because of the contractor's failure to complete the contract was indefinite.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 375.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

11. MARSHALING ASSETS AND SECURITIES (§ 1*)—SINGLE FUND—APPLICATION
     OF DOCTRINE.

    Where notes executed by a contractor to a bank, bearing the indorsement of R., were given for advancements made to enable the contractor to perform certain public improvement contracts, and an assignment of the contractor's right to receive payments from the city was made to the bank expressly to secure the notes, there was but a single fund for the payment of the bank's debts, notwithstanding the liability of the indorser; and hence the doctrine of marshaling assets was not applicable in favor of lien creditors of a contractor for materials furnished to enable him to perform the contracts.

    [Ed. Note.—For other cases, see Marshaling Assets and Securities, Cent. Dig. § 1; Dec. Dig. § 1.*]

Action by the C. T. Willard Company against the City of New York and others. Judgment for plaintiff for part of the relief demanded, and dismissing counterclaims by the city.

See, also, 142 N. Y. Supp. 9.

Cushing & Cushing, of New York City (Herman Elfers, of New York City, of counsel), for plaintiff.

Archibald R. Watson, Corp. Counsel, of New York City (John L. O'Brien, of New York City, of counsel), for defendant City of New York.

Morris v. Theall, of New York City, for defendant O'Connor.

John C. Wait, of New York City (Charles A. Winter, of New York City, of counsel), for defendants Ridgewood Nat. Bank, Title Guaranty & Surety Co., Peace Bros., and Ryan.

Charles E. F. McCann, of New York City, for defendant Contractors' Supply Co.

Alexander, Watriss & Polk, of New York City (Hugh M. Hewson, of New York City, of counsel), for defendant Henry Steers, Inc.

William H. Stayton, of New York City, for defendant Clinton Point Stone Co.

Eugene L. Bushe, of New York City, for defendant John Fox & Co.

F. P. Trautmann, of New York City, for defendant Rensselaer Mfg. Co.

Howard A. Sperry, of New York City, for defendant Van R. Swezey Coal & Lumber Co.

GIEGERICH, J. This action was originally brought to foreclose a lien acquired under a contract entered into on or about August 27, 1909, for a public improvement by the Robertson & Gerehart Contracting Company with the city of New York for regulating, grading, and paving Bay Ridge Parkway (extension of Shore Road), between Fourth avenue and Ft. Hamilton avenue, in the borough of Brooklyn, city and state of New York. It appears that the said Robertson & Gerehart Contracting Company, which for the sake of brevity will be referred to hereafter as the contractor, also entered into other contracts with the city of New York, among which was one for reg-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ulating, grading, and paving Bay Ridge avenue, between Fifth avenue and Thirteenth avenue, in the borough of Brooklyn, which was considered as part of the so-called Bay Ridge Parkway contract. Another contract was for the construction of filter beds adjacent to Oakland Lake, Bayside, Long Island, and is designated in the evidence and in the briefs as the Purification Plant contract; and still another contract was for regulating, grading, and paving Sixty-Seventh street, from Seventh avenue to Ft. Hamilton avenue, borough of Brooklyn. Upon a trial of the action, had in January, 1912, it appeared that certain persons, who it was claimed had an interest in the fund upon which the Bay Ridge lienors sought to impress their liens, were not parties to the action (see C. T. Willard Co. v. City of N. Y. et al., 142 N. Y. Supp. 9), and an order was made by me, upon due notice to all concerned, bringing in the lienors upon their contracts between the city and the said contractor.

After amended pleadings were served the trial of the case was continued before me, and all of the testimony taken upon the former trial was, by stipulation of counsel made in open court, considered to have been taken upon the present trial. Persons claiming liens upon the so-called Purification Plant contract proved the facts upon which their claims were based, and considerable testimony was further given in relation to the funds which it was claimed were applicable to pay the liens, and also regarding the counterclaim interposed by the city. It appears from the evidence that the defendant Ridgewood National Bank, which will be referred to as the bank, agreed to finance the contractor in its said contracts. For moneys loaned and advanced the contractor had first given its promissory notes, with the defendant Ryan as an accommodation indorser, until the contractor's limit had been reached as maker, and then the order was reversed, and Ryan became an accommodation maker, and the contractor discounted the paper as indorser. Ryan never had any account at the bank. As collateral security the contractor assigned to the bank "all moneys due or to grow due" under the said contracts, the assignments being dated as follows:

"Bay Ridge, September 23, 1909; Purification Plant, September 21, 1909; and Sixty-Seventh Street, September 24, 1909."

Such assignments were filed with the proper municipal officers, as well as with the county clerk, within a few days after their respective dates. The bank bonded the liens filed against the Bay Ridge Parkway contract, and gave an indemnity bond to the city in order to secure final payment on such contract. It also received from the city various sums for work performed under other contracts. It appears, however, that only one contract, viz., the Bay Ridge Parkway contract, was completed by the contractor. The moneys so received were applied as hereinafter stated. A balance of $7,040.21 is now in the hands of the bank, out of which it claims it should be reimbursed for premiums paid on bonds and allowed for attorney's fees claimed to have been incurred. A petition in bankruptcy was filed against the contractor on December 7. 1910, and it was adjudicated a bankrupt in the United States District Court for the Southern District of New York on De-

cember 22 of the same year. Liens for materials were filed against the Bay Ridge contract as follows:

| | | |
|---|---|---|
| Contractors' Supply Company, September 7, 1910 | $1,394 | 59 |
| Henry Steers, Incorporated, November 12, 1910 | 3,356 | 25 |
| C. T. Willard Company (plaintiff), November 29, 1910 | 1,767 | 88 |

Various liens were filed against the earnings of the Purification Plant contract, as follows:

1910.

| | | | | |
|---|---|---|---|---|
| November | 26. | Peace Bros | $2,834 | 38 |
| December | 7. | James Donovan | 175 | 00 |
| " | 8. | John Fox & Co | 1,709 | 87 |
| " | 10. | Patrick Ryan | 1,241 | 81 |
| " | 20. | Van R. Swezey Coal & Lumber Co | 176 | 89 |

1911.

| | | | | |
|---|---|---|---|---|
| January | 19. | Rensselaer Manufacturing Company | 1,082 | 87 |
| February | 4. | Consul General of Italy | 147 | 50 |

[1] It will be seen from the foregoing that the first lien was not filed until about a year after the assignments of the various contracts were filed. Such assignments, therefore, take precedence of the liens which were filed subsequent thereto. Contractors' Supply Co. v. City of N. Y., 153 App. Div. 60–64, 138 N. Y. Supp. 242, and cases there cited.

[2] It is claimed, however, by the Bay Ridge Parkway lienors, that the assignment of such contract was only to the extent of 85 per cent. thereof. This contention is based upon the following consent of the Title Guaranty & Surety Company to the assignment of the proceeds of such Bay Ridge Parkway contract by the contractor to the bank, viz:

"We hereby consent to the Robertson & Gerehart Contracting Company assigning to the Ridgewood National Bank such moneys as become due and payable on monthly estimates, except, however, that 15 per cent. be retained from each payment according to the contract, and shall not be assigned until the completion of the work. Title Guaranty & Surety Company, by Frederick C. Williams, Attorney in Fact. Attested: George Youngling, Resident Secretary, and the seal of the Title Guaranty & Surety Company, with the date September 24, 1909, attached thereto."

The assignment in question is absolute in form, and the bank by its terms became entitled to all the moneys due or to grow due under the said Bay Ridge Parkway contract. Its scope could not be limited by the surety on the bond given by the contractor to the city for the faithful performance of the work when the contract was awarded. The contract in question contains a provision for retaining a certain percentage of the moneys earned until the completion of the work. The sole purpose of such a provision is the protection of the city, and if the surety demanded for its own protection as a condition to its consent to the assignment a stipulation of a similar character to that contained in the contract, such provision was for its own benefit and did not inure to the benefit of the lienors who were strangers thereto, and hence the lienors cannot avail themselves of such limitation. Fortunato v. Patten, 147 N. Y. 277, 41 N. E. 572; Episcopo v. Mayor, 35 Misc. Rep. 623, 633, 72 N. Y. Supp. 140.

By no stretch of language can a purpose to compel the bank to retain a percentage of the sums earned under the contract for the benefit of the lienors be spelled out of the consent of the surety. The contract having been performed, the bank became entitled, notwithstanding the attempted limitation, to all moneys under the contract, at least to the extent of the debt. The last payment which was made by the city was upon the Bay Ridge Parkway contract on April 25, 1911, when it paid to the bank $11,591.77. Such sum was the final payment under said contract, and part of it was necessary to liquidate the indebtedness due from the contractor to the bank. Some of the lienors gave notice to the bank not to collect any moneys above the amount to which it was entitled.

[3] The bank was compelled to give an indemnity bond to the city in order to obtain such final payment. It has not been made to appear that the city would have paid just enough to wipe out the indebtedness of the contractor to the bank and allowed the balance to stand to the credit of the contract. But this point is immaterial anyway, since the balance, no matter in whose hands it may be, is subject to whatsoever liens may have attached thereto.

[4] I think, however, in view of the circumstances, and of the further fact that the bank's report to the banking department shows that the said balance was classed as a general deposit, thus showing that the bank had use of the money, it should be required to pay interest on such balance from said April 25, 1911.

[5] The bank claims that the balance in its hands should be subject to the payment of premiums on bonds or attorney's fees. This is opposed by certain lienors. The assignments do not contain any provision whatever for the payment of said premiums or attorneys' fees. I think, however, that it is not necessary to pass upon the question whether or not such payments could be directed to be made out of the fund in suit, since it clearly appears from the instrument hereinafter set forth that the bank accepted the defendant Ryan's indemnity to pay such premiums and attorney's fees. That indemnity was given after the bank had received all the moneys due under the Bay Ridge Parkway contract and it read as follows:

"Ryan-Parker Construction Company, General Contractors. Main Office: City Investing Building, 165 Broadway, New York. April 25, 1911. Ridgewood National Bank, Cypress and Myrtle Avenue, Brooklyn, N. Y. Honorable Board of Directors—Gentlemen: I am informed by my attorney that you have now received and collected all the moneys due and owing from the city of New York on account of one assignment to the Ridgewood National Bank by Robertson & Gerehart Contracting Company, and my attorney, Mr. John C. Wait, advises me that you desire a statement from me as to indemnity ,for moneys paid or to be paid to the Title Guaranty & Surety Company for premiums on bonds required by the city to indemnify lienors and the comptroller, and also to indemnify from the payment for services and disbursements rendered and had by Wait & Foster in the defense of lien actions by said lienors. In view of the situation, I hereby undertake and agree to indemnify the Ridgewood National Bank and its officers for any moneys paid for such premiums on said bonds as shall be paid by the Ridgewood National Bank out of moneys received from the city of New York under its said assignment, or to the said Wait & Foster, as attorneys, for services and disbursements in defending actions of lienors or others to secure said funds received by the Ridgewood National Bank under said assignment, provided the

same shall be collected by judgment or order of the court or by compromise, in which the said attorneys, Wait & Foster, or I myself may consent. This will be my guaranty to reimburse and indemnify the said Ridgewood National Bank for the said disbursements as aforesaid.

"Very truly yours,        [Signed]  P. Ryan."

As above shown, there is a fund in the hands of the bank, which takes the position that it holds certain moneys claimed by competing interests, and asks the court to determine what disposition shall be made of that fund, or that the bank may be judicially freed from all responsibility as to its stewardship.

[6] The next question therefore is: To whom does such fund belong? It was held in Herrmann & Grace v. Hillman, 203 N. Y. 435, 441, 96 N. E. 741, that to entitle a lienor to recover on a lien against a municipality it is incumbent upon him to show either that the contractor performed his contract, and that by reason of such performance some amount became due and owing thereon, or that by reason of some special provision of the contract there was, when the lien was filed, something due such contractor thereon, or that something became due him upon it thereafter which was applicable to the payment of such lien. The lienors under the Bay Ridge Parkway contract claim that they are entitled to the fund because the last payment by the city to the bank, amounting to $11,591.77, on April 25, 1911, came from such contract and produced the balance in question. The city had previously, viz., on March 8, 1911, paid on account of such contract the sum of $11,430.22. The last money which the bank received prior to these two payments was on November 7, 1911, when it received $1,546.22 from the Purification Plant contract.

The counsel for the bank contends that, notwithstanding the last money came out of the Bay Ridge Parkway contract, certainty of identification is lacking. All moneys paid by the city went into the so-called collateral account, contributions to which came from five different sources, as follows:

| | |
|---|---:|
| Received from the Bay Ridge Parkway contract | $ 68,067 38 |
| Received from the Bay Ridge Avenue contract | 1,452 50 |
| Received from the Purification Plant contract | 11,687 26 |
| Received from the Sixty-Seventh Street contract | 11,143 35 |
| Received from the Robertson & Gerehart Contracting Company | 1,835 32 |
| Total | $ 94,185 81 |

The general deposits (which included $24,903.74 paid on account of loans) amounted to...................................... 83,763 73

Which brought the credit side of the account to the sum of...... $177,949 54

There is due to the bank as follows:

| | | |
|---|---:|---:|
| For loans | $39,465 07 | |
| For advances | 69,288 97 | |
| For overdrafts, interest, &c | 1,460 17 | |
| For checks | 60,695 10 | |
| | | $170,909 33 |

Leaving a balance of.................................... $  7,040 21

It appears from the evidence that until the last payment of $11,-591.77 on the Bay Ridge Parkway contract was received the contrac-

tor was indebted to the bank, and that such payment, as well as all previous payments, went into the collateral account, and that transfers were made to the general account as needed. The lienors under the Purification Plant contract claim that the moneys derived from such contract made it possible for the contractor to earn the moneys received from the Bay Ridge Parkway contract. In support of such claim it is pointed out that the Purification Plant contract produced $11,687.26 up to November 7, 1910; that a petition in involuntary bankruptcy was filed against the contractor on December 7, 1910, at which time the Bay Ridge Parkway contract had not been completed; and that the only new money which was received from the bank by the contractor after the first lien was filed on September 7, 1910, viz., that of the Contractors' Supply Company, was a discount of $1,500 on November 9, 1910, two days after the last payment on such Purification Plant contract had been made. It is further urged by such lienors that, previous to the last two payments under the Bay Ridge Parkway contract, the last money received from that work was paid about nine months previously, viz., in June, 1910; that after that time monthly payments came from the Purification Plant contract in the months of July, August, and September; that during this period two payments were made upon the Sixty-Seventh street contract, amounting to $6,523.35, from which payments they assume that that job took care of itself; that payments for materials used for the performance of the Purification Plant contract were postponed, in order that the money realized from such contract might be utilized to finish upon the Bay Ridge Parkway contract. By reason of these facts, such lienors argue that they should have priority as to the so-called bank surplus, either on equitable principles or on the theory that such surplus was Purification Plant contract money returned after being temporarily borrowed.

I have no difficulty in identifying the moneys received from the said last payment of April 25, 1911, not only as coming from the Bay Ridge Parkway contract, but also as properly belonging to the fund arising from the performance of that contract. They are, therefore, applicable to the payment of the liens filed under that contract. While the evidence satisfies me that the moneys received from the Purification Plant contract were used for the purpose of finishing the Bay Ridge Parkway contract, I do not think that the lienors under the former should have the priority claimed for them, because neither group of lienors filed their liens until after the last payment under such Purification Plant contract was made. Although the sums so derived from the Purification Plant contract were absorbed by the bank, I am nevertheless of the opinion that under the broad principles of equity which are applicable to a case of this character (Close et al. v. Clark et al. [Com. Pl.] 9 N. Y. Supp. 538; Murphy v. Stickley Simonds Co., 82 Hun, 158, 31 N. Y. Supp. 295), compensation in the nature of interest should be allowed for the use of said moneys during the time it was employed in completing the Bay Ridge Parkway contract, and that such interest should run from the date of each payment to the date of said final payment, viz., April 25, 1911, and, furthermore, that the sum total of such interest should be impressed

with an equitable lien upon the funds in the hands of the bank in favor of those who furnished materials or did work in aid of the performance of the Purification Plant contract in amounts proportionate to the amounts of their respective claims as established on this trial.

Payments upon such Purification Plant contract were made as follows: October 20, 1909, $1,835.32; December 30, 1909, $2,076.55; July 26, 1910, $2,655.45; August 31, 1910, $2,400.77; September 30, 1910, $1,172.95; November 7, 1910, $1,546.22. Total payments, $11,687.26. It results from what has been said that there should first be deducted from the said balance in the hands of the bank, with interest, the moneys so impressed, with an equitable lien in favor of the claimants under the said Purification Plant contract, and that the residue belongs to the lienors under the Bay Ridge Parkway contract, after first deducting certain costs and disbursements, as hereinafter directed.

[7] The plaintiff upon the former trial, as well as at the present one, insisted that the lien of the defendant Henry Steers, Incorporated, arising from the Bay Ridge Parkway contract, had expired, because it had not obtained an order extending the lien, nor filed a notice of pendency of action. In the recently decided case of Berger Mfg. Co. v. City of N. Y., 206 N. Y. 24, 32, 99 N. E. 153, 155, the court said:

"The plaintiff having commenced an action, which it has sustained, and having duly filed a lis pendens, and the defendants Goemann & Sisti and the Hall's Safe Company having each interposed an answer in the action setting up its lien, as provided by the Lien Law, before its lien had expired, it was not necessary for either to commence a further and independent action to foreclose its lien."

In the statement of facts in the foregoing case it appeared that the defendants Goemann & Sisti filed their lien on October 28, 1908, and on January 26, 1909, obtained an order extending it for six months. The action was commenced and a notice of lis pendens was filed by the plaintiff (another lienor) on January 28, 1909. In the present case we have a precisely similar situation. The defendant Henry Steers, Incorporated, filed its lien on November 26, 1910. By an order of this court the lien was extended for six months from February 11, 1911. This action was commenced by another lienor and a lis pendens was filed on April 7, 1911, and the answer of the defendant Henry Steers, Incorporated, was interposed on August 8, 1911, as appears from the plaintiff's admission of service. The lien of the defendant Henry Steers, Incorporated, is therefore a valid one, and is second in priority upon the funds resulting from the said Bay Ridge Parkway contract.

[8] As already shown, those claiming to have acquired a lien under the Purification Plant contract have no claim upon the funds held by the bank, except an equitable lien upon the interest of the moneys earned from such Purification Plant contract, and which were used to finish the Bay Ridge Parkway contract. Such claimants urge, however, that they have a lien upon the sum of $4,637.78, which the city saved by having one Lewis complete the contract after it had served notice on the contractor and the surety on its bond declaring the work abandoned. It appears that by the terms of the Purification Plant

contract the contractor was to be paid $26,400.01. The total amount paid to the contractor was $11,687.26; the total amount paid to Lewis was $10,074.97—$21,762.23, showing a saving to the city of $4,637.78. The city claims that the contractor did not finish the work and that consequently nothing is now due under the contract. The city has also interposed a counterclaim (1) for liquidated damages at the rate of $20 per day, claimed to have been suffered by reason of the contractor's delay in doing the work and in failing to complete it, and (2) for $14,200, the amount which the city claims it was compelled to pay for water purchased from the Citizens' Water Supply Company because the contractor failed to complete the Purification Plant contract.

The Purification Plant contract, among other things, provides that all work specified must be done in strict conformity with the specifications and plans, and that all necessary scaffolding, tools, derricks, tackle, implements, and appliances necessary or proper for the purpose of constructing and erecting the plant are to be furnished and done at the contractor's expense. Paragraph D states that the decision of the engineer shall be final upon all questions which may arise relating to the execution of the contract, and that his estimate and decision shall be final and conclusive. It is further provided:

"Such estimate and decision, in case any question shall arise, shall be a condition precedent to the right of the contractor to receive any money under this contract."

Paragraph K of the contract provides as follows:

"(K) If the work to be done under this contract shall be abandoned by the contractor, or if this contract shall be assigned or the work sublet by him otherwise than is herein specified, or if at any time the engineer shall be of the opinion, and shall so certify in writing to the commissioner, that the performance of this contract is unnecessarily or unreasonably delayed, or that the contractor is willfully violating any of the conditions or covenants of this contract or specifications, or is executing the same in bad faith, or not in accordance with the terms thereof, or if the work be not fully completed within the time named in this contract for its completion, the commissioner shall notify the contractor to discontinue all work, or any part thereof, under this contract, by a written notice to be served upon the contractor, either personally or by leaving said notice at his residence or with his agent in charge of the work, or with any employé found on the work, and thereupon the contractor shall discontinue the work, or such part thereof as the commissioner may designate, and the commissioner shall thereupon have the power to contract for the completion of the contract in the manner prescribed by law, or to place such and so many persons as he may deem advisable, by contract or otherwise, to work at and complete the work herein described, or such part thereof, and to use such materials, scaffolding, derricks, tools, machinery, etc., as he may find upon the line of the work, and to procure other materials for the completion of the same, and to charge the expense of said labor and materials to the contractor; and the expense so charged shall be deducted and paid by the city out of such moneys as may be due or may at any time thereafter grow due to the contractor under and by virtue of this contract or any part thereof. And in case such expense shall exceed the amount which would have been payable under the contract if the same had been completed by the contractor, he shall pay the amount of such excess to the city; and in case such expense is less than the sum which would have been payable under this contract, if the same had been completed by the contractor, then the contractor shall forfeit all claim to the remainder."

Paragraph N provides that the contractor shall pay promptly in cash for all labor and materials, and that no lien shall be placed under any provision of the Lien Law. Paragraph X of the contract provides:

"The contractor will not be entitled to demand or receive payment for any portion of the work or materials unless the same shall be fully completed in the manner set forth in this contract and specifications, and such completion shall be duly certified by the engineer, and until each and every one of the stipulations hereinbefore mentioned are complied with, and the work completed to the satisfaction of the commissioner and accepted by him, and the final certificate of the completion and acceptance thereof, signed by the commissioner and engineer, be filed with the comptroller."

Paragraph Z provides that the action of the engineer, by which the contractor is to be bound and concluded according to the terms of this contract, shall be that evidenced by his final certificate.

The contractor entered upon the performance of the contract, but never completed it. After doing some work, for which $11,687.26 was paid to the bank by virtue of said assignment upon estimates of the engineer, the contractor abandoned the contract on November 30, 1910, a few days after which, as seen, a petition in involuntary bankruptcy was filed against it. On or about December 8, 1910, a formal notice of abandonment was served by the city upon the contractor and upon the sureties, declaring the work abandoned; such notice being given as a preliminary to employing some one else to complete the contract. U. S. v. McMullen, 222 U. S. 460, 32 Sup. Ct. 128, 56 L. Ed. 269.

As already shown, Lewis was given the contract to complete the work at a sum less than the amount remaining unpaid under the contract, and the lienors claim that they are entitled to the moneys so saved by the city. Reliance is placed by the lienors upon the rule laid down in Fraenkel v. Friedmann, 199 N. Y. 351, 92 N. E. 666, and cases there cited, that where a contractor fails to perform a building contract as provided therein and abandons it, and the owner elects to "terminate the employment" pursuant to the provisions of such contract, and completes the contract, the lien attaches to the extent of the difference between the cost of completion and the amount unpaid upon the contract when the lien was filed. In Herrmann & Grace v. Hillman, supra, the board of education of the city of New York entered into a contract with one Richard W. Hillman to erect a heating and ventilating plant in a public school building in the borough of the Bronx, New York City, and the contract provided that, on default by the contractor, the board of education could cancel it and proceed to finish the work and furnish the material required so as to fully execute it in every respect, and further, that:

"The cost and expense thereof at the reasonable market rates shall be a charge against the contractor, who shall pay to the party of the first part the excess thereof, if any, over and above the unpaid balance of the amount to be paid under this contract; and the *contractor shall have no claim or demand to such unpaid balance, or by reason of the nonpayment thereof to them.*"

And it was held that after the contract was forfeited the contractor had no rights of any kind whatever under it, and hence liens filed

against him attached only to the sum actually due to him at the time of the forfeiture. The court in that case, in the course of its opinion, said:

"All of the authorities referred to by the appellants tending in any way to sustain their position are based upon contracts and upon facts that are entirely different from the contract and the facts in this case. The contract with Hillman not only expressly provides, as we have shown, that the amount thereof shall not be paid until the full completion of the same according to the terms of the contract, but it provided generally as to the rights of the parties in case of a failure to perform the contract as provided therein."

The court, adverting to the provision of the contract above quoted, said (page 444 of 203 N. Y., page 743 of 96 N. E.):

"By this provision of the contract in case it was legally declared forfeited the contractor has no rights of any kind whatever under the contract."

The court also called attention to section 5 of the Lien Law, which, so far as applicable, provides that a person furnishing materials "to a contractor, his subcontractor or legal representative, for the construction of a public improvement pursuant to a contract by such contractor with the state or a municipal corporation, shall have a lien * * * upon the moneys of the state or of such corporation applicable to the construction of such improvement, to the extent of the amount. due or to become due on such contract, upon filing a notice of lien as prescribed in. this article," and also to section 60 of the same act, by which it is provided that in an action to enforce a lien on account of a public improvement, if the court finds that the lien is established, it shall render judgment directing the state or the municipal corporation to pay over to the lienors entitled thereto for work done or materials furnished for such public improvement—"to the extent of the sums found due the lienors from the contractors—so much of the funds or money which may be due from the state or municipal corporation to the contractor as will satisfy such liens, with interest and costs, not exceeding the amount due to the contractor."

Upon the facts of that case, the prominent features of which have been above outlined, the court held (page 444 of 203 N. Y., page 743 of 96 N. E.) that:

"The appellants failed to show that at the time of filing their liens, respectively, or at any time thereafter, there was anything due under the contract applicable to the payment of their liens."

Paragraph K of the contract in the case at bar provides that, where the contract is completed at the expense of a contractor who has abandoned the contract, "and in case such expense is less than the sum which would have been payable under this contract if the same had been completed by the contractor, then the contractor shall forfeit all claim to the remainder." Applying the principles of the decision in the case of Herrmann & Grace v. Hillman, supra, it is evident that the lienors under the Purification Plant contract have no right whatever to the moneys so saved by the city.

The case of Herrmann & Grace v. City of New York, 130 App. Div. 531, 114 N. Y. Supp. 1107, affirmed 199 N. Y. 600, 93 N. E. 376,

on opinion of Scott, J., below, cited by certain lienors under the Purification Plant contract, has no application, because it does not appear that the contract there contained any provision for the forfeiture of any of the moneys which might be saved by the city in completing the contract after the contractor had abandoned it. If there was such a provision, the point was not raised by the city, and consequently the decision in that case is not applicable. The city retained the sum of $1,298.58, being 10 per cent. of the estimated value of the work done, which, under the provisions of the contract, is not payable until 30 days after the completion and acceptance of the work. As the contractor failed to perform the terms of the contract, the lienors have no claim to such retained percentage.

Mr. Thomas J. Gerehart, who was the treasurer and general manager of the contractor, testified that after the sixth or last payment, and prior to the time of the abandonment of the Purification Plant contract, the city's then assistant engineer in charge of the work under the said contract made up an estimate that approximately between $5,000 and $6,000 was due for work done since such last payment, and that there was a discussion with the chief engineer of the department of water supply, gas, and electricity in the presence of such assistant engineer as to the payment of the same. The assistant engineer denied having made such an estimate, and both he and the chief engineer denied having had a discussion of the character claimed. Paragraph Y of the contract provides that the estimate entitling the contractor to a partial payment must be "made and certified in writing to the commissioner" by the engineer. This was not done; Mr. Gerehart testifying that the estimate "never reached the point where it had been served." As no estimate in conformity with the foregoing provisions is claimed to have been made, the lienors cannot claim any benefit therefrom. It will be seen from what has preceded that, other than an equitable lien of the character above pointed out, there is nothing due to the contractor or those claiming under him upon the Purification Plant contract, and therefore there is nothing to which a lien can attach (Herrmann & Grace v. Hillman, supra; Kelly v. Bloomingdale, 139 N. Y. 343, 34 N. E. 919), and the lienors will be confined to a personal judgment against the party liable for the debt (Lien Law, § 54).

[9] As above stated, the city interposed two counterclaims, viz., one for liquidated damages and the other for the amount claimed to have been paid to obtain water. Paragraph S of the contract provides:

"In case the contractor shall fail to complete the work hereunder in accordance with the specifications, and to the satisfaction of the commissioner and engineer within the time aforesaid, the contractor shall and will pay to the city the sum of $20 for each and every day the time consumed in said performance and completion may exceed the time hereinbefore allowed for that purpose, which said sum, in view of the difficulty of ascertaining the loss which the city will suffer by reason of delay in the performance of the work hereunder, is hereby agreed upon, fixed, and determined by the parties hereto as the liquidated damages that the city will suffer by reason of said delay and default, and not as a penalty; and the city shall and may deduct and retain the amount of such liquidated damages out of the moneys which may be due or become due to the contractor under this agreement."

It is clear from a reading of the foregoing clause that the parties intended to provide only for the payment of liquidated damages where there is a delay in the completion of the contract, and not where the contractor abandons the contract, and that the remedy of the city is limited to retaining the amount of such liquidated damages out of sums due on the contract. In this case there was no amount due on the contract, as already shown, and consequently there was nothing for this provision to operate upon. The counterclaim for liquidated damages is therefore dismissed.

[10] As to the counterclaim for water purchased, I think that it should also be dismissed, because the proof as to the amount of water which the city was actually compelled to purchase because of the failure to complete the contract is indefinite. Furthermore, there is no proof that during the early stages of the operation of the purification plant it could filter an amount of water equal to that which was bought for the city from the Citizens' Water Supply Company, nor is there any proof of the amount which it would cost the city to operate the waterworks to supply the water and to operate the purification plant to render the water fit for use. Moreover, there is no evidence from which it can be determined with any degree of certainty the actual amount of water the city was compelled to purchase because the purification plant had not been completed, nor can any exact time be fixed when a charge for such purpose should commence.

[11] The defendants John Fox & Co. invoke the doctrine of marshaling assets and securities, arguing that the bank holds two claims for security for all the moneys owing to it from the contractor, viz., assignments of the moneys to be earned by the contractor under the contracts above mentioned and promissory notes either made by the contractor or the defendant Ryan and indorsed by one or the other of them, as above noted. The difficulty with this contention is that it loses sight of the fact that the assignments were taken by the bank for the specific purpose of securing the payment of the promissory notes, which, as shown, were for moneys loaned and advanced to the contractor, and that on default in the payment of the notes the bank was simply to pay itself and return the notes to the depositor; i. e., the contractor. If I am right in this, then there is but one fund applicable to the payment of the debt, and as there must be two funds or properties in order to apply the doctrine of marshaling assets (26 Cyc. 930; 19 Am. & Eng. Enc. of L. [2d Ed.] 1286), the point made by the said defendant is not well taken. Apart from this, it is fairly inferable from the evidence and the brief submitted in behalf of the defendant Ryan that if the bank were compelled to resort to the promissory notes it would be involved in litigation, and in these circumstances the doctrine will not be applied. 26 Cyc. 930.

My conclusion is that the plaintiff is entitled to judgment establishing its lien, with costs and disbursements, and that the said defendant Ridgewood National Bank has in its hands the sum of $7,040.21, upon which it will pay interest from April 25, 1911, and out of which principal and interest it will pay, without any deductions for premiums on bonds and attorney's fees, to the lienors under the Bay Ridge Park-

way contract, in the order of the priority of their respective liens, with interest, after first deducting the moneys impressed with an equitable lien in favor of the claimants under the said Purification Plant contract as hereinbefore stated, and the plaintiff's costs and disbursements of this action, and the disbursements of such defendants as have paid out moneys for stenographers' fees, all of which will be taxed; and if there is any surplus the same will be paid to the trustee in bankruptcy of the said defendant the Robertson & Gerehart Contracting Company. If there be a deficiency, the plaintiff may have a personal judgment, as provided by section 54 of the Lien Law; but it cannot, as requested, have judgment against the defendant the Title Guaranty & Surety Company, which joined the bank as surety in the execution of the bond given to discharge the lien, because the bond was not given by the contractor who owed the debt, but by one against whom no personal judgment could be rendered. Contractors' Supply Co. v. City of N. Y., supra. Furthermore, that there is no fund under the Purification Plant contract, except that resulting from the equitable lien above mentioned, applicable to the payment of the liens filed thereunder, and the lienors will therefore be confined to a personal judgment. The judgment should also contain a dismissal of the counterclaims of the city. The decision and judgment may contain a provision that the defendant Ridgewood National Bank is entitled to retain all the moneys collected by it from the city by virtue of the said assignments, and apply the same in payment of the debt due to it from the said defendant Robertson & Gerehart Contracting Company, except the said sum of $7,040.21, with interest from April 25, 1911, which principal and interest it is directed to pay out as above provided. As the granting of any further costs would greatly diminish the fund available for the payment of the plaintiff's lien, which, as above noted, is third in priority, no costs will be allowed to any party other than the plaintiff. If there are any other provisions which either of the parties would like to have inserted in the decision and judgment, they should be incorporated in requests for findings.

Let requests for findings be served by the various parties upon their adversaries within five days after the publication of this opinion, and let all the requests be then handed in to the clerk, with proof of service, within three days after such service, together with such memoranda as the parties may desire to submit in support of their own requests or in criticism of those of their adversaries. The papers have been returned to the clerk to await compliance with these directions.